**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GOBIND  MODI,                                         )
                                                      )        Case No. 1:12-6985
                          Plaintiffs,                 )
                                                      )
             v.                                       )        CLASS ACTION
                                                      )
RUSSELL R. WASENDORF, SR.,                            )
RUSSELL R. WASSENDORF, JR.,                           )        **JURY TRIAL DEMANDED**
NEIL J. ASLIN, BRENDA CUYPERS,                        )
SUSAN O'MEARA, VERAJA-                                )
SNELLING COMPANY, VERAHA-                             )
SNELLING, U.S BANK, N.A,                              )
NATIONAL FUTURES                                      )
ASSOCIATION, and JOHN DOES 1-10,                      )
                                                      )
                          Defendants.

**CLASS ACTION COMPLAINT**

Plaintiff Gobind Modi ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), by his undersigned counsel, brings this action against defendants Russell R. Wasendorf, Sr. ("Wasendorf Sr."), Russel R. Wasendorf Jr., Neil J. Aslin, Brenda Cuypers, and Susan O'Meara (the "Other Peregrine Officers"), and Veraja-Snelling Company and Jeannie Veraja-Snelling (the "Auditors"),  U.S. Bank, N.A., National Futures Association, and John Does 1-10 ("John Does";  Wassendorf Sr., the Other Peregrine Officers, the Auditors and the John Does are collectively referred to as "Defendants").  Plaintiff makes the following allegations upon personal knowledge as to those allegations specifically pertaining to him, and upon information and belief based upon investigation of counsel and publicly available documents as to all other matters.

## I. NATURE OF THE ACTION

1.      This action arises out of Wasendorf, Sr.'s commingling and theft of over $215 million of Plaintiff's and approximately 24,000 other futures account customers of Peregrine Financial Group, Inc. (PFG) (the "Class," as more particularly defined below) funds, as well as all other Defendants' failure to exercise reasonable oversight, inquiry, and diligence with regard to PFG, facilitating and enabling Wasendorf, Sr.'s unlawful conduct, leading to the bankruptcy of PFG, and causing the loss of Plaintiff's and the Class' funds.

2.      PFG was a registered futures commission merchant ("FCM"), known to its customers by the name PFGBest.   FCMs receive money, securities and other property ("customer funds") from their customers to margin, guarantee, or secure the customers' futures and options trades. Under the Commodity Exchange Act (the "CEA" or "Act"), 7 U.S.C. §§ 1 et seq. (2006), the Act, as amended,[1] to be codified at 7 U.S.C. §§ 1 et seq., and the Commission's Regulations (the "Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 et seq. (2011), FCMs are required to segregate and separately account for all customer funds.

3.      Wasendorf Sr. was PFG's chief executive officer ("CEO") and sole owner.  On July 9, 2010, a 911 call reported a possible suicide attempt at PFG's headquarters in Cedar Falls, Iowa.  In responding to the call, emergency personnel found Wasendorf Sr. unresponsive in his automobile.  They also found an apparent suicide note addressed to Wasendorf Sr.'s wife and a signed statement in which Wasendorf Sr. admitted committing fraud, embezzling millions of

---

[1] The Commodity Exchange Act, as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008) and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203 ("Dodd-Frank Act"), Title VII (the Wall Street Transparency and Accountability Act of 2010), §§701-774, 124 Stat. 1376 (enacted July 16, 2010).

dollars from customer accounts at PFG, and forging bank statements and other documents intended for auditors and regulators to hide this fraud. The signed statement further indicated that this all started nearly twenty years ago. In follow up conversations with law enforcement, Wasendorf Sr. acknowledged that he wrote and signed this statement, that the information contained in the statement was true, and that he estimated that amount of loss due to his fraud to exceed $100 million.

4. In fact, the shortfall in PFG customer accounts, and the likely loss due to Wasendorf Sr.'s fraud and all other Defendants' oversight failures, was greater than $200 million.

5. PFG and Wasendorf Sr. used customer funds for purposes other than those intended by PFG customers. They commingled, misappropriated, stole and spent customer funds. The whereabouts of all customer funds is currently unknown – what is known is that over $200 million of such funds are not in a segregated and separate PFG customer account where they should have been.

6. As a result, Wasendorf Sr. was arrested and then charged in a criminal complaint, *see* Criminal Complaint (Dkt. No. 2), *United States v. Wasendorf, Sr.*, Case No. 1:12-mj-131 (N.D. Iowa) ("*US v. Wasendorf, Sr.*"), PFG filed a voluntary petition for Chapter 7 bankruptcy protection, *see* Voluntary Petition (Dkt. No. 1), *In re: Peregrine Financial Group, Inc.*, Case No. 12-27488 (Bankr. N.D. Ill.) ("*In re Peregrine*"), the Commodities Futures Trading Commission ("Commission" or "CFTC") filed a complaint for injunctive and other equitable relief and civil monetary penalties under the Commodity Exchange Act against Wasendorf Sr. and PFG, *see* Complaint (Dkt. No. 1), *U.S. Commodity Futures Trading Commission v. Peregrine Financial Group, Inc. and Russell R. Wasendorf, Sr.*, Case No. 1:12-cv-05383 (N.D. Ill.) ("*CFTC v.*

*Peregrine*"), and Plaintiff and the other members of the Class were deprived of over $200 million of their PFG customer funds.

7.    Plaintiff, individually and behalf of all other members of the proposed Class, based on the facts and circumstances detailed herein, brings this action against Defendants and seek redress for Wasendorf Sr.'s failure to segregate customer funds in violation of Section 4d(a) of the CEA (Count I), Wasendorf Sr.'s fraud by misappropriation in violation of section 4(b)(1)(A) and (C) of the CEA, as amended (Count II), fraud in connection with commodity futures contracts in violation of section 4b(a)(2)(A), (B), and (C) of the CEA, as amended (Count III), breach of fiduciary duty (Count IV), aiding and abetting breach of fiduciary duty (Count V), unjust enrichment (Count VI), theft, conversion and misappropriation (Count VII), aiding and abetting theft, conversion, and misappropriation (Count VIII), interference with contract rights (Count IX); aiding and abetting tortious conduct (Count X), negligence (Count XI), and negligent supervision (Count XII).

## II.  **PARTIES**

### *Plaintiffs*

8.    PLAINTIFF Gobind Modi is a resident of Toronto, Canada.  Mr. Modi  was a futures account customer of PFG, held cash collateral in PFG accounts, and has not received a return of 100% of those funds from PFG, its affiliates, or the Defendants as of the close of business on July 10, 2012, or at any other time to date, and has incurred losses and damages as a result of the activities alleged in this Complaint.  Plaintiff has suffered injury-in-fact for which he is entitled to seek monetary damages and equitable relief.

*Defendants*

9.     Defendant Russell R. Wasendorf, Sr. served as the CEO and sole owner of PFG at all relevant times. He has been registered with the Commission as an associated person ("AP") of PFG since 1992. Wasendorf Sr. is named as a defendant in this action solely to toll the statute of limitations pursuant to §IV(A) of the Court's July 10, 2012 Order Appointing Temporary Receiver in *CFTC v. Peregrine Financial Group, Inc., et al,* No. 12-cv-5383. Upon information and belief, Wasendorf Sr. is a resident of Iowa.

10.     Defendant Russell R. Wasendorf, Jr., is President and Chief Operating Officer of PFG. Wasendorf Jr. is the son of Defendant Wasendorf Sr. Part of Wasendorf Jr.'s duties and responsibilities as an officer of PFG is to monitor and safeguard customer segregated funds.

11.     Neil J. Aslin is President of Peregrine Asset Management, Inc. (PAM) and Vice Chairman of PFG which he joined 1998. Part of Aslin's duties and responsibilities as an officer of PFG was to monitor and safeguard customer segregated funds.

12.     Brenda Cuypers is Chief Financial Officer of PFG which she joined in 1994. From approximately 1994 to 2000, Cuypers began her career at PFG as a staff accountant responsible for account balancing and producing a daily segregated funds report. In or about the year 2000, Cuypers was promoted to Controller of the firm and served in that capacity for six years. In or about the year 2006, Cuypers was then promoted to CFO of the company. Part of Cuypers' duties and responsibilities as an officer of PFG was to monitor and safeguard customer segregated funds.

13.     Susan O'Meara served as the Chief Compliance Officer of PFG which she joined in 1997. O'Meara was responsible for the overall compliance of PFG and its branches and introducing brokers. According to PFG, O'Meara possessed "extensive regulatory knowledge"

and "[led] PFG to impeccable annual reviews from the self regulatory body of the futures industry, the National Futures Association (NFA)." Prior to joining PFG, O'Meara worked at the NFA in Chicago as senior compliance auditor. During her tenure at the NFA, she was pivotal in developing computerized audits. She began her career in the futures industry as a staff auditor with the NFA. In her role at the NFA, O'Meara audited member firms, reviewed financial statements and investigated compliance issues. Part of O'Meara's duties and responsibilities as an officer of PFG was to monitor, and safeguard customer segregated funds.

14.     Veraja-Snelling Company is an accounting firm located in Glendale Heights, Illinois. According to PFG's financial statement ended Dec. 31, 2010, Veraja-Snelling Co. served as PFG's auditor during some or all of the relevant period and certified that PFG was in compliance with federal commodities regulations governing the segregation of customer money.

15.     Jeannie Veraja-Snelling is the sole owner of Veraja-Snelling Co. and a resident of Glendale Heights, Illinois. Part of Veraja-Snelling Company and Veraja-Snelling's duties and responsibilities as outside auditors of PFG was to ensure that the proper procedures and safeguards were in place and followed in order to safeguard customer segregated funds.

16.     U.S. Bank (formerly Firstar Bank), a subsidiary of U.S. Bancorp, is a bank incorporated in Delaware and headquartered in Minneapolis, Minnesota.  U.S. Bank had custody of PFG customers' segregated funds at relevant times.  U.S. Bank has branches throughout the country, including in this District.

17.     The National Futures Association ("NFA") is a Delaware not-for profit organization with its headquarters in Chicago, Illinois. It is a self-regulatory association organized under the authority of §17 of the CEA and is overseen by the CFTC. At all relevant

times, NFA was PFG's designated self-regulatory organization, responsible for overseeing and auditing PFG for compliance with applicable rules and regulations.

18. In addition to the Individual Defendants, Plaintiffs allege, upon information and belief, that certain persons whose precise identities are presently unknown, referred to in this Complaint as John Does 1-10, failed to segregate, commingled or otherwise misappropriated the funds of Plaintiffs and/or members of the Class with the funds of PFG or the funds of its subsidiaries, affiliates or other unknown persons or entities, in violation of the CEA, 7 U.S.C. §§ 1 et seq., or improperly converted, dissipated, accepted, used, transferred, took possession of, or failed to retain such funds, or improperly borrowed, pledged, repledged, transferred, hypothecated, rehypothecated, loaned, or invested (including to purchase or sell securities pursuant to repurchase agreements or reverse repurchase agreements) such funds in violation of multiple provisions of law as alleged in this Complaint. Plaintiffs are presently unaware of the names and identities of those Defendants identified and sued as John Does 1-10 in this Complaint. Unless otherwise stated, all references to the Defendants collectively in this Complaint include each of the John Does 1-10.

### III.  JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this action arises under the laws of the United States, including 7 U.S.C. §§ 1 *et seq.*, and 28 U.S.C. § 1334(b) as this action is related to *In re Peregrine* bankruptcy case. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and more than two-thirds of the members of the proposed Class are citizens of states different than those of Defendants.

20. Venue in this District is proper under 28 U.S.C. § 1391(b), 7 U.S.C. §§ 1 *et seq.*, and 7 U.S.C. § 25(c) because Defendants' unlawful course of conduct occurred in large part in this District and because the alleged conduct included violations of the CEA.

## IV.   FACT ALLEGATIONS

21. The futures industry is both government and self-regulated.

**Government Regulation through the CFTC**

22. Congress enacted the CEA in 1936 following the breakdown of markets for commodities futures and options contracts during the Great Depression to help ensure the proper and efficient functioning of those markets.

23. With certain exceptions, all persons and organizations that intend to do business as futures professionals must register under the CEA.

24. A futures commission merchant or "FCM" is defined in Section 1a(28) of the CEA, as amended, to be codified at 7 U.S.C. § 1a(28), as any individual, association, partnership, corporation or trust that is engaged in soliciting or accepting orders for the purchase or sale of any commodity for future delivery and, "in or in connection with such solicitation or acceptance of orders, accepts any money, securities or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."

25. Customer funds are defined in Regulation 1.3(gg), 17 C.F.R. § 1.3(gg) (2012), as "all money, securities, and property received by a futures commission merchant or by a clearing organization from, for, or on behalf of customers or options customers."

26. Under Regulation 1.10(b), 17 C.F.R. § 1.10(b) (2012), with limited exception, FCMs must file monthly financial reports with the Commission through CFTC Form 1-FR-FCM,

commonly known as a "1-FR" or "financial report." Pursuant to Regulation 1.32, 17 C.F.R. § 1.32 (2012), FCMs must also monitor and compute their segregation requirements and customer funds on deposit in segregated accounts on a daily basis and maintain copies of these reports, commonly known as a "daily segregation computation."

27.     The safety of the customer accounts is not insured by the federal government in the way that, for example, the safety of deposits in banks is insured by the Federal Deposit Insurance Corporation. Instead, the CEA ensures the safety of client funds and fosters confidence within the marketplace by mandating that customer funds be segregated and not commingled or used by the firm itself, absent certain stringent restrictions.

28.     The essence of the CEA's strict segregation requirement is that when client accounts are properly segregated, there will be no risk of the loss of customer funds even in the event that a commodities firm fails, as PFG did. As a result, for the past 75 years, commodities account holders (including Plaintiffs and Class Members) have relied on the CEA's regulatory scheme and the industry's efforts to self-regulate to protect their assets and have not viewed the financial peril of brokerage firms as a risk to the funds in their customers' accounts.

**Self Regulation**

29.     The same legislation that authorized the creation of the CFTC also authorized the creation of "registered futures associations," giving the futures industry the opportunity to create a nationwide self-regulatory organization.

30.     Pursuant to that legislative grant of authority, the futures industry created the National Futures Association ("NFA"), which regulates every firm or individual who conducts futures trading business with public customers.

31.     The NFA is a not-for-profit industry membership corporation formed as a registered futures association authorized under Section 17 of the CEA, 7 U.S.C. § 21, that operates under the supervision of the CFTC. Its membership is comprised of FCMs and other futures professionals registered with the CFTC. The NFA is responsible, under CFTC oversight, for certain aspects of the regulation of these futures entities and their APs.  The NFA focuses primarily on the qualifications and proficiency, financial condition, retail sales practices, and business conduct of its members.

32.     In addition, all individuals and firms that wish to conduct futures-related business with the public must apply for NFA Membership or Associate status.

33.     At all relevant times to this Complaint, the NFA was PFG's designated self-regulatory organization ("DSRO") responsible for monitoring and auditing PFG for compliance with the minimum financial and related reporting requirements of the domestic exchanges of which PFG was a member.

34.     PFG is and was at all relevant times a registered FCM located at 311 West Monroe St., Suite 1300, Chicago, Illinois, and was one of the nation's largest non-bank, non-clearing FCMs.

**PFG Assured Customers that it Segregated Customer Accounts and was in Compliance with Regulations**

35.     During the relevant time period, PFG, by and through defendants Wasendorf Sr., the Other Peregrine Officers, and the John Does, assured PFG's customers, including Plaintiff and members of the Class that "PFGBEST strives to be an industry leader in innovation while at the same time recognizing that its success is absolutely driven by the diligent and respectful care of customers and their accounts" and that "PFGBEST is not only customer-centric, but compliance-focused. We consider it a privilege to have your business and to represent your

interests in extensive industry thought leadership in the media, at global conferences, as published authors, spokespersons and partners."

36.     In the immediate wake of the collapse of MF Global – the first instance in the history of the commodities futures industry in which there has been a loss of customer funds as a result of improper handling, failure to segregate, and misappropriate of such funds, resulting loss of over $1.6 billion to MF Global's customers – Defendant Wasendorf Jr. further assured PFG clients, including Plaintiff and the Class, in PFG press release made available on the PFG Best website, that stated as follows:

> Dear PFGBEST customers:
>
> In the wake of MF Global Holdings Ltd. filing for Chapter 11 protection yesterday, and continuing investigation into whether and how MF Global failed to keep clients' collateral separate from its own accounts, I would like to reaffirm the absolute dedication of PFGBEST to protect you and your PFGBEST accounts.
>
> PFGBEST is not only customer-centric, but compliance-focused. We consider it a privilege to conduct business with you and to be an advocate for you. We abide by all regulations mandated by the CFTC and the rules of NFA to hold customer funds in segregated accounts that are always separate from operational funds. PFGBEST reports daily and monthly to the regulators concerning customer segregated funds. An independent, certified audit is conducted annually in addition to periodic, regular audits by NFA and information requests from the CFTC and exchange representatives.
>
> It is our policy to keep extra funds on deposit in our customer segregation accounts to protect you.
>
> PFGBEST has significant excess capital. Currently, PFGBEST holds 169% of the net capital required by the CFTC and NFA. All PFGBEST capital is held in cash or U.S. Treasury bills. PFGBEST does not use subordinated debt as capital.
>
> PFGBEST does not clear customer transactions with MF Global, and it is not a counterparty for PFGBEST.
>
> PFGBEST does not do proprietary trading; the only trading done by PFGBEST is in specific instances by emerging CTAs that PFGBEST allocates funds to (always less than $100k) so that they can become "products" that the PFGBEST Managed

Futures Division can then offer to customers. The total amount of funds currently allocated is less than $400k.

PFGBEST is in communication with regulators and exchanges to assist in any way with solutions for the MF Global customers impacted by recent events.

Thank you.

Russ Wasendorf, Jr.
President and Chief Operating Officer

37.     Unfortunately, these assurances were false.

**Wasendorf Sr. Admittedly Commingled and Stole from Customer Accounts**

38.     In an affidavit dated July 12, 2012, made in support of the *US v. Wasendorf, Sr.* criminal complaint, William F. Langdon, Special Agent (SA) with the Federal Bureau of Investigation, provided details regarding Wasendorf Sr.'s alleged attempted suicide and admissions of a nearly 20 year fraudulent scheme in which PFG customer funds were not segregated, but were instead commingled with other funds and misappropriated by Wasendorf Sr. and PFG.  A copy of the affidavit is attached as Exhibit A hereto.

39.     In the affidavit, SA Langdon swore that on July 9, 2012, at approximately 8:05 a.m., a 911 call reported a possible suicide attempt at Peregrine Financial Group, Inc., One Peregrine Way, Cedar Falls, Iowa.   Upon arrival, emergency personnel found Defendant Wasendorf Sr. unresponsive in his automobile at PFG's headquarters in Cedar Falls.   The emergency responders also found an apparent suicide note to Wassendorf Sr.'s wife and a signed statement detailing fraud committed by Wasendorf through PFG over the past twenty years.

40.     SA Langdon further swore that at approximately the same time as the discovery of the unresponsive Wasendorf Sr., Wasendorf Jr. arrived at PFG's Cedar Falls office and found an exact copy of the signed statement detailing fraud as well as another apparent suicide note to Wasendorf Jr.

41.    In the signed statement, Wasendorf Sr. wrote, in part:

I have committed fraud. For this I feel constant and intense guilt. I am very remorseful that my greatest transgressions have been to my fellow man. Through a scheme of using false bank statements I have been able to embezzle millions of dollars from customer accounts at Peregrine Financial Group, Inc. The forgeries started nearly twenty years ago and have gone undetected until now. I was able to conceal my crime of forgery by being the sole individual with access to the US Bank accounts held by PFG. No one else in the company ever saw an actual US Bank statement. The Bank statements were always delivered directly to me when they arrived in the mail. I made counterfeit statements within a few hours of receiving the actual statements and gave the forgeries to the accounting department.

42.    Later in the signed statement, Wasendorf Sr. wrote, in part:

. . . I had no access to additional capital and I was forced into a difficult decision: Should I go out of business or cheat? I guess my ego was too big to admit failure. So I cheated, I falsified the very core of the financial documents of PFG, the Bank Statements. At first I had to make forgeries of both the Firstar Bank Statements and the Harris Bank Statements. When I choose [sic] to close the Harris Account I only had to falsify the falsify the Firstar statements [elsewhere in the signed statement Wasendorf noted that Firstar "eventually became US Bank"]. I also made forgeries of official letters and correspondence from the bank, as well as transaction confirmation statements.

Using a combination of Photo Shop, Excel, scanners, and both laser and ink jet printers I was able to make very convincing forgeries of nearing [sic] every document that came from the Bank. I could create forgeries very quickly so no one suspected that my forgeries were not the real thing that had just arrived in the mail.

With careful concealment and blunt authority I was able to hide my fraud from others at PFG. PFG grew out of a one man shop, a business I started in the basement of my home. As I added people to the company everyone knew I was the guy in charge. If anyone questioned my authority I would simply point out that I was the sole shareholder. I established rules and procedures as each new situation arose. I ordered that US Bank statement were to be delivered directly to me unopened, to make sure no one was able to examine an actual US Bank Statement. I was also the only person with online access to PFG's account using USBank's online portal. On US Bank side, I told representatives at the Bank that I was the only person they should interface with at PFG.

When it became a common practice for Certified Auditors and the Field Auditors of the Regulators to mail Balance Confirmation Forms to Banks and other entities holding customer funds I opened a post office box. The box was originally in the

name of Firstar Bank but was eventually changed to US Bank. I put the address "PO Box 706, Cedar Falls, IA 50613-0030" on the counterfeit Bank Statements. When the auditors mailed Confirmation Forms to the Bank's false address, I would intercept the Form, type in the amount I needed to show, forge a Bank Officer's signature and mail it back to the Regulator or Certified Auditor.

When online Banking became prevalent I learned how to falsify online Bank Statements and the Regulators accepted them without question.

43.    On July 9, 2012, according to SA Langdon's Affidavit, Wasendorf Sr. was interviewed by law enforcement at the University of Iowa Hospital in Iowa City, Iowa. During the course of that interview, Defendant Wasendorf Sr. acknowledged that he wrote the signed statement set forth above using a computer at his residence and that the information contained in the statement was true. Defendant Wasendorf Sr. estimated the amount of loss due to his fraud exceeded $100 million.

44.    SA Langdon's affidavit further stated that Wasendorf Jr. reported to law enforcement that, to determine if Wasendorf Sr.'s statements in the signed statement set forth above were accurate, Wasendorf Jr. obtained a purported bank statement for PFG's US Bank account ending in 845, titled "Customer Segregated Acct," for the month ending December 31, 2011, i.e., the 1845 Customer Segregated Account; that Wasendorf Jr. obtained the purported statement from PFG's accounting department; that the ending balance on the purported bank statement was $221,770,946.18; that Wasendorf Jr. subsequently obtained the bank statement for the same period directly from US Bank personnel; and that the bank statement obtained from US Bank personnel indicated an ending balance as of December 31, 2011 of $6,337,628.14.

45.    SA Langdon's affidavit further set forth, that in an interview with law enforcement on July 9, 2012, Defendant Cuypers, the Chief Financial Officer of PFG, verified she used the purported bank statement from PFG's accounting department indicating a balance of $221,770,946.18 as of December 31,2011when she prepared PFG's year end financial

statement. The financial statement upon which Defendant Cuypers allegedly relied reflected an inflated amount of customer segregated funds; those statements were also sent to PFG's regulators including the CFTC.

46.     According to PFG, Cuypers was been instrumental in overseeing accounting and financial planning at the firm and led the company's worldwide staff of accountants and clerks. In addition to the firms' U.S. operations, brokers and Commodity Trading Advisors, Cuypers was responsible for accounting fulfillment for PFG Canada and PFG Asia. The theft and/or misappropriation of over $100 million of customer funds by PFG and Defendant Wasendorf Sr. was the direct and proximate result of Defendant Cuypers' failure(s) of reasonable oversight, inquiry and diligence.

47.     SA Langdon's affidavit also stated that in an interview with law enforcement on July 10, 2012, a PFG employee whose responsibilities included reconciling PFG's customer segregated funds confirmed that she used the US Bank customer segregated account balances as reflected in PFG's internal accounting system in calculating the amount of PFG's customer segregated funds for regulatory purposes.

48.     PFG customer segregated account verification records in possession of the NFA (and obtained from the CFTC) include falsified US Bank statements and corresponding account confirmation forms purporting to be for PFG's 1845 Customer Segregated Account held at US Bank.

49.     The US Bank statements falsified by Defendant Wasendorf Sr. and the corresponding account confirmation forms list US Bank's address as "P.O. Box 706, Cedar Falls, IA 50613-0030."

50. According to the FBI, one of the US Bank 1845 Customer Segregated Account statements falsified by Defendant Wasendorf Sr. is for the period ending February 28, 2010 and reports a total balance of $207,260,962.28 in the account. The FBI further alleged that a corresponding account confirmation form reports the same balance and bears a purported signature of an authorized representative of US Bank. Another such US Bank statement is for the period ending March 31, 2011 and reports a total balance of $218,650,550.98 in the account. A corresponding account confirmation form reports the same balance and bears a purported signature of an authorized representative of US Bank. Further, the FBI has alleged that, according to the CFTC, the foregoing US Bank 1845 Customer Segregated Account statements falsified by Defendant Wasendorf Sr. were sent to the NFA.

51. In his Affidavit, SA Langdon stated that law enforcement obtained copies of actual statements for PFG's US Bank 1845 Customer Segregated Account for the time periods including February 28, 2010, and March 31, 2011. According to the actual statements from US Bank, on February 28, 2010, the account held a total of $9,171,177.08, and on March 31, 2011, the account held total of $7,181,336.36.

52. Upon information and belief, in addition to US Bank, customer funds belonging to Plaintiffs and the Class were also held in bank accounts at other financial institutions the identity of which has not yet been ascertained; including custodian accounts that held or continue to hold customer deposits and clearing accounts that held or continue to hold customer margin and cash.

53. On August 13, 2012 Wasendorf Sr. was indicted by the United States Attorney in this District on 2 counts of submitting false and fraudulent year-end financial statements on behalf of PFG to the CFTC and 29 counts of submitting false and fraudulent monthly reports on

behalf of PFG to the CFTC.  *See* U.S. v. Wasendorf, Sr., Dkt. No. 2, U.S.D.C. Northern District of Iowa, 6:12-cr-02021-LRR.

**PFG Failed to Segregate Customer Accounts and All Other Defendants Failed to Conduct Reasonable Oversight, Enabling Wasendorf Sr.'s Unlawful Actions and the Commingling of Customer Funds**

54.     As detailed above, from as early as 1992 through the present ("Relevant Time"), PFG and Defendant Wasendorf, Sr., failed to maintain adequate customer funds in segregated accounts because Defendant Wasendorf Sr. intentionally stole and misappropriated those funds.

55.     During some or all of the Relevant Time, the Other Peregrine Officers and the Auditors negligently and/or recklessly facilitated and failed to detect the unlawful conduct. During at least this same period, PFG and Wasendorf Sr. filed false reports with the CFTC regarding the amount of customer segregated funds held by PFG.

56.     Throughout the Relevant Time, PFG, by and through Wasendorf Sr., and with the assistance of the Other Peregrine Officers and the Auditors, purported to maintain segregated funds on behalf of its customers, including Plaintiffs and the Class, in account XXXX1845 ("1845 Customer Segregated Account") at a U.S. Bank branch in Cedar Falls, Iowa.

57.     Although Wasendorf Sr. was one of three signatories to the 1845 Customer Segregated Account, he exercised complete dominion and control over all aspects of the account with the knowledge and consent of the Other Peregrine Officers and the Auditors.

58.     The Other Peregrine Officers and the Auditors thus facilitated and enabled Wasendorf Sr. to carry out the fraud and theft from Plaintiffs and the Class, to which he has admitted, as a direct and proximate result of their individual knowing and willful failures to adequately exercise reasonable and independent oversight, inquiry and diligence as PFG's senior officers and independent auditors.

**Known Shortfalls in PFG Customer Accounts and False Report Filing**

59.     On or about February 28, 2010, PFG records showed a balance of approximately $207 million in the 1845 Customer Segregated Account. PFG had received at least that amount from customers. However, the actual balance in the account was less than $10 million.

60.     On or about March 30, 2011, PFG records showed a balance of approximately $218 million in the 1845 Customer Segregated Account. PFG had received at least that amount from customers. However, the actual balance in the account was less than $10 million.

61.     In July 2012, NFA conducted an audit of PFG. In connection with the audit, Wasendorf Sr. falsely represented to NFA that it held in excess of $220 million in the 1845 Customer Segregated Account, when, in fact, that account held approximately only $5.1 million.

62.     On or about July 9, 2012, PFG records showed a balance of approximately $225 million in the 1845 Customer Segregated Account. PFG had received at least that amount from customers. However, the actual balance in the account was approximately $5 million.

63.     In its capacity as an FCM, PFG filed monthly 1-FR statements with the CFTC. One section of the 1-FR statements requires the reporting of "funds in segregation for customers trading on U.S. Commodity Exchanges." Those statements are filed electronically.

64.     Since August 15, 2011, PFG and Defendant Wasendorf Sr. filed and or caused to be filed at least three 1-FR statements on behalf of PRG which falsely reported the amount of funds in customer segregated accounts.

65.     Furthermore, the Other Peregrine Officers, the Auditors, and the John Does, as a direct and proximate result of their individual knowing and willful failures to adequately exercise reasonable and independent oversight, inquiry and diligence as PFG's senior officers and

independent auditors, caused or permitted at least three 1-FR statements on behalf of PFG that inaccurately reported the amounts of funds in customer segregated accounts.

**U.S. Bank Permits Wasendorf Sr.'s Fraud**

66.     A U.S. Bank branch in Cedar Falls, Iowa was the home of the 1845 Account, which was supposed to hold over $200 million in Customer Funds.

67.     Although Wasendorf, Sr. claims to have carried out this fraud alone, it is virtually unthinkable that he would have been able to do so.

68.     A July 27, 2012 Reuters article titled "Russell Wasendorf, Sr., PFGBest CEO, Had 'Some Type of Assistance in Fraud': Son's Lawyer," stated:  "The possibility of a wider involvement [beyond Wasendorf, Sr.] was raised publicly a day ago by Daniel Roth, president of the National Futures Association.  [Nicholas] Iavarone [an attorney for Wasendorf, Sr. who also represented PFG for two decades before its collapse] said it would be logical for Wasendorf, Sr. to have had some assistance within the banking or auditing sectors outside Peregrine."

69.     Indeed, U.S. Bank is under investigation for its role in the theft of Customer Funds.  According to a July 11, 2012 UPI report entitled "U.S. Bank Investigated in Peregrine Case":  "Investigators are looking into U.S. Bank's role in overseeing client funds for Peregrine Financial Group, officials said Wednesday.  U.S. regulators are investigating the alleged disappearance of $215 million from Peregrine."

70.     A July 12, 2012, report by the *Wall Street Journal* entitled "Peregrine Scandal Widens" states:  "Regulators now are looking into the potential role of a U.S. Bank employee whose name and signature may have been used by Mr. Wasendorf in his alleged fraud, according to one person close to the probe.  Investigators aim to determine whether this person was complicit in the alleged scheme, the person said."

71.     Even if U.S. Bank had no direct knowledge of Wasendorf, Sr.'s fraud until it became public, U.S. Bank was grossly negligent in failing to detect the fraud.

72.     As stated above, Wasendorf, Sr. regularly reported to regulators that the 1845 Account carried a balance of over $200 million, when in fact the balance was less than $10 million.   U.S. Bank was aware of the purpose of the 1845 Account and the stringent rules governing segregation of Customer Funds.   U.S Bank knew, or should have known, that the balance of the 1845 Account was woefully insufficient to cover the segregated deposit requirements of a firm the size of PFG.   Indeed, the evidence of PFG's size and financial footprint was plainly visible everywhere.

73.     For example, PFG's website touted the size of its business:

[PFG} is ranked for more than 11 consecutive years in the annual Futures magazine roundup as one of the nation's Top 50 Brokers.

PFGBEST has been growing both organically and through acquisitions.   It remains well capitalized and prepared to acquire customer assets of substantial competitors in futures, forex, options, and technology firms when opportunities arise.   PFGBEST is a contender to be one of the largest and most successful retail futures and exchange brokerages in the country.   *It currently has more than $600 million in customer assets in segregated futures and forex accounts.*

74.     PFG also spent lavishly.   According to a July 16, 2012 piece in the *Huffington Post*:

"They spent money like it was going out of style, and I know they didn't have a [lot] of income, so where's the money coming from?" said [former PFG employee Werner] Maevski, who worked at an independent brokerage firm in Chicago until this past April and is now interviewing for a new job.   "You have to justify it with the business.   But the business did not justify the amount of expenditures they had."

Maevski pointed to such red flags as PFG's lavish multimillion-dollar headquarters in Cedar Falls and a trade magazine Peregrine published called *SFO* that Maevski said had few subscribers, but on which the company focused a great deal of attention.   "We assumed that PFG was breaking even and that Wasendorf

was making money from other business dealings," said [former PFG employee Travis] Cochran.

75.     PFG also built a palatial headquarters in Cedar Falls, described as follows in a July 14, 2012 *Bloomberg News* report titled "Fall of Peregrine's Wasendorf Presaged at Christmas Party":

> Peregrine spent millions to construct the Cedar Falls headquarters, which are on One Peregrine Way and are hidden in woods behind a security gate.  The complex, which includes child-care facilities, is adjacent to the Beaver Hills Country Club, where Wasendorf has a private parking spot with a name tag.
>
> Said [Phil] Flynn, the former PFGBest analyst, who visited the headquarters once: "They had everything in there – food, a daycare center.  They have more baby beds than a baby hospital."

76.     In addition to the $18 million dollar corporate headquarters, PFG owned its own corporate jet, housed at the Waterloo, Iowa airport.

77.     Due to these factors and others, U.S. Bank knew, or should have known, that the balance of the 1845 Account was far less than what it should have been.

**NFA Permits Wasendorf Sr.'s Fraud**

78.     At all relevant times to this Complaint, the NFA was PFG's designated self-regulatory organization responsible for monitoring and auditing PFG for compliance with the minimum financial and related reporting requirements of the domestic exchanges of which PFG was a member.

79.     Again, although Wasendorf, Sr. claims to have carried out this fraud alone, it is virtually unthinkable that he would have been able to do so.

80.     Even if the NFA had no direct knowledge of Wasendorf, Sr.'s fraud until it became public, NFA was grossly negligent in failing to detect the fraud.  The NFA ignored clear

and obvious warning signs of the conduct of these Defendants consituting gross negligence and bad faith.

81.     According to its website in a section titled "NFA"s Role in the U.S. Futures Industry", the NFA states that it "regulates every firm or individual who conducts futures trading business with public customers."

82.     Further, the NFA on its website in a section titled "How NFA Fights Fraud and Abuse, affirmatively represents that it serves the following functions:

*"Rigorous registration requirements*. NFA thoroughly screens all firms and individuals wishing to do business with the public on any U.S. futures exchange. Applicants must meet stringent fitness requirements, including providing fingerprint cards for background checks. In addition, registrants must pass comprehensive proficiency testing requirements. We also have the authority to deny, revoke, suspend, restrict or condition any firm's or individual's registration."

*"Comprehensive compliance rules*. Over the years, NFA has adopted stringent rules covering a wide variety of areas such as advertising, telephone solicitations, risk disclosure, discretionary trading, disclosure of fees, minimum capital requirements, reporting and proficiency testing. Just as importantly, we perform audits and examinations of our Members to monitor compliance with those rules. We also conduct financial surveillance to enforce compliance with NFA's financial requirements."

*"Strong enforcement authority*. NFA has the authority to take disciplinary actions against any firm or individual who violates its rules, ranging from Warning Letters for minor rule infractions to formal Complaints in cases where rule violations warrant prosecution. Penalties resulting from Complaints include expulsion, suspension for a fixed period, prohibition from future association with any NFA Member, censure, reprimand and a fine of up to $250,000 per

violation. NFA often collaborates with the CFTC, the FBI and other law enforcement agencies to ensure successful prosecutions."

*"Trade practice and market surveillance*. The futures industry has changed dramatically in the past few years. Long-established methods of trading, such as open-outcry, have given way to electronic trading at both traditional and new all-electronic exchanges. NFA provides a variety of regulatory services and programs to electronic exchanges to ensure the fair treatment of customers and to maintain orderly markets."

83.     Further, on its website under a section titled "Meeting the Regulatory Needs of an Evolving Industry", the NFA "pledges to always strive to be a unique exemplary self-regulation organization", including "[o]ne that safeguards the integrity of the marketplace."

84.     In its 2011 Annual Review, the NFA states that in fiscal year 2010, it launched a new Risk Management System, "which defines a comprehensive set of risk factors and then evaluates those factors against data from individual firms, allowing NFA to focus its resources on the most high-risk Member firms and react quickly when necessary."

85.     In a highly detailed account questioning the role of NFA in the fraud, Attain Capital Management called for regulatory overhaul.[2]  Specifically, it stated that:

> A cursory glance at the news coverage that emerged from this disaster reveals a myriad of disconcerting questions relating to the competence and integrity of the NFA. Here is a summation of what has been reported, with the important caveat that we are only passing on the news here, and have do not have direct access to these reports ourselves:

- Reports have surfaced that there were emails raising concerns about PFGBest segregated account protections in front of both the CFTC and NFA as early as 2004.

---

[2] http://managed-futures-blog.attaincapital.com/2012/07/16/vote-of-no-confidence-a-call-to-investigate-the-national-futures-association/

- The NFA failed to verify the mailing address of the financial institutions with whom they were attempting to ascertain account balances – despite the fact that one phone call would have revealed the scheme.
- The NFA was, in our opinion and based on the information we've seen, slow in response to the reticence of PFGBest regarding authorizing electronic confirmation of account balances.
- The NFA, according to recent reports, was made aware of a discrepancy in account balances prior to this week's revelation after contacting U.S. Bank directly at one point, but accepted a fax that purported to rectify the account shortfall without substantiating the source of the fax as adequate contradictory proof.
- The NFA failed to dig deeper and reveal the fraud during what was represented to market participants and the public as thorough spot checks following MFGlobal.
- The NFA maintained Russ Wasendorf Sr.'s position on their FCM committee, even after assessing them with a substantial fine for failure to supervise earlier this year.
- Additional reports have surfaced from current and prior NFA members regarding other areas of concern related to competency and consistency, including admitted poor understanding of the industry by auditors and abysmal responsiveness to member concerns.

86.     Upon information and belief, the NFA overlooked the conduct of one of its most prominent members.  Had the NFA performed the affirmative monitoring and surveillance functions as represented, it would have known or should have known that Wasendorf Sr. and PFG were not following industry rules that required customer funds be segregated and not commingled or used by the firm itself, absent certain stringent restrictions, none of which existed in the present case.

## V.   CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action individually and as a class action, pursuant to the provisions of Rules 23(a), 23(b)(1)(B), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All entities and individuals who were futures account customers of Peregrine Financial Group, Inc. (PFG), who held open commodity futures or options positions, swaps, and/or cash collateral or cash deposits for future collateral in their PFG accounts, and who had not received a return of 100% of their funds from PFG, its affiliates, or the Defendants as of the close of business on July 10, 2012.

(the "Class"). Excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judges to whom this case is assigned and any immediate family members thereof.

88.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

89.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The approximately 24,000 members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, Class members are dispersed throughout the United States. The precise number of Class members and their addresses is presently unknown to Plaintiff, but may be ascertained from PFG's and Defendants' books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

90.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include:

> a.  whether Class members' funds were improperly commingled with the funds of PFG and the identities of those responsible for such commingling;
>
> b.  whether Class members' funds were misappropriated and by whom;
>
> c.  whether and how the Other Peregrine Officers and Auditors failed to detect or prevent the unlawful conduct alleged herein or engaged in other oversight failures;

d.   whether Defendants other than the Auditor Defendants violated the CEA;

e.   whether Defendants breached duties owed to the Class members;

f.   the amount of money improperly and unlawfully diverted out of PFG's segregated customer accounts;

g.   whether Defendants aided and abetted others' breaches of fiduciary duty;

h.   whether Defendants aided and abetted others' theft, conversion, and misappropriation;

i.   whether Defendants aided and abetted others' tortuous interference with contractual rights;

j.   whether Plaintiffs and the other Class members are entitled to damages and the proper measure of such damages;

k.   whether Plaintiffs and the other Class members are entitled to equitable relief, including but not limited to the creation of a constructive trust.

91.     Defendants engaged in a common course of conduct giving rise to the legal rights Plaintiffs seek to enforce on their own behalf and on behalf of the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

92.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the other Class members because, among other things, all Class members were comparably injured through Defendants' uniform misconduct described above and all were similarly victims of Wasendorf, Sr.'s theft and all Defendants' oversight failures. Further, there are no defenses available to Defendants that are unique to Plaintiffs.

93.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**
Plaintiffs are adequate Class representatives because their interests do not conflict with the
interests of the other Class members they seek to represent; they have retained counsel
competent and experienced in complex class action litigation; and Plaintiffs will prosecute this
action vigorously.  The Classes' interests will be fairly and adequately protected by Plaintiffs and
their counsel.

94.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is
superior to any other available means for the fair and efficient adjudication of this controversy,
and no unusual difficulties are likely to be encountered in the management of this class action.
The damages or other financial detriment suffered by Plaintiffs and the other Class members are
relatively small compared to the burden and expense that would be required to individually
litigate their claims against Defendants, so it would be impracticable for Class members to
individually seek redress for Defendants' wrongful conduct.  Even if the Class members could
afford individual litigation, the court system could not.   Individualized litigation creates a
potential for inconsistent or contradictory judgments, and increases the delay and expense to all
parties and the court system.  By contrast, the class action device presents far fewer management
difficulties and provides the benefits of single adjudication, economy of scale, and
comprehensive supervision by a single court.  Given the similar nature of the Class members'
claims, class treatment of this litigation will ensure that all claims and claimants are before this
Court for consistent adjudication thereof and will be easily managed by the Court and the parties
to this action.

95.     **Limited Fund Situation – Federal Rule of Civil Procedure 23(b)(1)(B).**  The
prosecution of separate actions by individual customers of PFG would create a risk of

adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other customers who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests should Defendants' combined unencumbered assets fail to equal the over $200 million shortfall in the segregated customer accounts at PFG.

## VI.  CLAIMS ALLEGED

### Count I
### Violations of Section 4d(a) of the CEA and CFTC Regulation 1.20(a)
### (Failure to Segregate Customer Funds)
### (Against Wasendorf Sr., Other Peregrine Officers, and John Does 1-10)

96.     Plaintiff incorporates by reference Paragraphs 1 - 95 of this Complaint, as though fully stated herein.

97.     This claim is asserted against Wasendorf Sr., the Other Peregrine Officers, and the John Does 1-10.

98.     Section 4d(a) of the CEA, as amended, 7 U.S.C.§ 6d(a), makes it unlawful for an FCM to solicit or accept orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market unless it treats and deals with all money, securities, and property received by it to margin, guarantee, or secure the trades or contracts of any customer, or accruing to such customer as the result of such trades or contracts, as belonging to such customer.

99.     CFTC Regulation 1.20(a), 17 C.F.R. § 1.20(a) (2012), requires in part that all customer funds be separately accounted for and segregated as belonging to commodity or option customers and deposited under an account name which clearly identifies them as such and shows that they are segregated as required by the CEA and Regulations.

100.    Under Section 25(a)(1) of the CEA, as amended, 7 U.S.C. § 25(a)(1), any person who violates the CEA, or who willfully aids, abets, counsels, induces or procures a violation of the CEA, is to be held liable for any actual damages resulting from, among other things, such violation to any person who deposited with or paid to such person money, securities, or property in order to engage in commodity futures or options contract trading.

101.    From at least February 2010 through the present, PFG, by and through Defendant Wasendorf Sr., failed to treat customer funds as belonging to its customers and failed to segregate and separately account for customer funds. By this conduct, PFG and Defendant Wasendorf Sr. violated Section 4d(a) of the CEA, as amended, 7 U.S.C. § 6d(a), and CFTC Regulation 1.20(a) (2012).

102.    Defendant Wasendorf Sr. controlled PFG and willfully aided, abetted, counseled, commanded, induced and procured the acts constituting PFG's violations alleged in this count. Defendant Wasendorf Sr. is therefore additionally liable for PFG's violations of Section 4d(a) of the CEA, as amended, 7 U.S.C. §6d(a), and CFTC Regulation 1.20(a), 17 C.F.R. §1.20(a) (2012), pursuant to Section 13c(a) of the CEA, 7 U.S.C. § 13c(a) (2006).

103.    By their knowing and willful failures to adequately exercise reasonable and independent oversight, inquiry and diligence as PFG's senior officers, the Other Peregrine Officers and the John Does 1-10 willfully aided, abetted, induced, counseled, or procured the acts constituting PFG's violations alleged in this count. The Other Peregrine Officers and the John Does 1-10 are therefore additionally liable for PFG's violations of Section 4d(a) of the CEA, as amended, 7 U.S.C. §6d(a), and CFTC Regulation 1.20(a), 17 C.F.R. §1.20(a) (2012), as pursuant to Section 13c(a) of the CEA, 7 U.S.C. § 13c(a) (2006).

104.    Each and every day that PFG, and/or defendants Wasendorf Sr., the Other Peregrine Officers and the John Does 1-10 failed to segregate customer funds constitutes a separate and distinct violation of Section 4d(a) of the CEA Act, as amended, 7 U.S.C. §6d(a), and CFTC Regulation 1.20(a), 17 C.F.R. § 1.20(a) (2012).

105.    Plaintiff and the Class are each entitled to recover for each of the Defendants, jointly and severally, the actual damages they suffered resulting from the violations of the CEA and CFTC Regulations alleged herein.

**Count II**
**Violations of Section 4(b)(1)(A) and (C) of the CEA, as amended**
**(Fraud by Misappropriation)**
**(Against Wasendorf Sr. and Does 1-10)**

106.    Plaintiff incorporates by reference Paragraphs 1 - 95 of this Complaint, as though fully stated herein.

107.    This claim is asserted against Defendant Wasendorf Sr and Does 1-10.

108.    Section 4b(a)(1)(A), (C) of the CEA, as amended, 7 U.S.C. §6b(a)(1)(A), (C), makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person: (A) to cheat or defraud or attempt to cheat or defraud such other person; or (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for such other person.

109.    By misappropriating customer funds for purposes other than those intended by its customers, PFG, by and through Defendant Wasendorf Sr., and Defendant Wasendorf Sr.

individually, violated Section 4b(a)(1)(A), (C) of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), (C).

110.    Defendant Wasendorf Sr. controlled PFG and willfully aided, abetted, counseled, commanded, induced and procured the acts constituting the violations by PFG alleged in this count. Defendant Wasendorf Sr. is therefore additionally liable for PFG's violations of Section 4b(a)(1)(A), (C) of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), (C) pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2006).

111.    Each and every day that PFG and/or Defendant Wasendorf Sr. misappropriated customer funds for purposes other than those intended by its customers constitutes a separate and distinct violation of Section 4b(a)( 1)(A), (C) of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), (C).

112.    As a direct and proximate result of the wrongful conduct of the Defendants named in this Count, Plaintiff and the other proposed Class members suffered substantial damages.

113.    Plaintiff and the Class who deposited with or paid to PFG money, securities, or property in order to engage in commodity futures or options contract trading on or subject to the rules of a designated contract market in the United States are each entitled to actual damages for the violations of the CEA alleged herein.

**Count III**
**Violation of Section 4b(a)(2)(A), (B), and (C) of the CEA, as amended**
**(Fraud in Connection with Commodity Futures Contracts)**
**(Against Wasendorf Sr. and Does 1-10)**

114.    Plaintiff incorporates by reference Paragraphs 1 - 95 of the Complaint, as though fully stated herein.

115.    This claim is asserted against Defendant Wasendorf Sr and Does 1-10.

116.    Section 4b(2)(A), (B) and (C) of the CEA, 7 U.S.C. § 6b(a)(2) makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 7a (g) of this title, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market -- (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person . . .

117.    Defendant Wasendorf Sr. and/or PFG, individually and/or in concert, in or in connection with commodity futures contracts made, or to be made, for or on behalf of other persons, cheated or defrauded, or attempted to cheat or defraud, customers and willfully deceived or attempted to deceive customers by, among other things, knowingly making transfers of customer segregated funds in a manner designed to avoid detection, improperly diverting customers' cash and commingling it with PFG own funds, willfully making or causing to be made false reports or statements or willfully entering or causing to be entered false records, and converting customers funds for its own use in violation of 7 U.S.C. § 6b(a)(2)(A), (B), and (C).

118.    As a direct and proximate result of the wrongful conduct of the Defendant Wasendorf Sr., Plaintiff and the other proposed Class members suffered substantial damages.

119.    Plaintiff and the Class who deposited with or paid to PFG money, securities, or property in order to engage in commodity futures or options contract trading other than on or subject to the rules of a designated contract market in the United States are each entitled to actual damages for the violations of the CEA alleged herein.

**Count IV**
**Breach of Fiduciary Duty**
**(Against Wasendorf Sr., Other Peregrine Officers, and John Does 1-10)**

32

120. Plaintiff incorporates by reference Paragraphs 1 - 95 of this Complaint, as though fully stated herein.

121. This claim is asserted against Wasendorf Sr., the Other Peregrine Officers, and the John Does 1-10.

122. Wasendorf Sr., the Other Peregrine Officers, and the John Does 1-10 exercised the power to direct the use of commodity customers' money, securities, or other property which had been deposited with and entrusted to PFG to allow such customers to trade commodity futures and options contracts through PFG.

123. As senior officers and/or directors of PFG, Defendants Wasendorf Sr., he Other Peregrine Officers, and the John Does were responsible for preserving the safety and security of the property of Plaintiffs and members of the proposed Class by adopting and adhering to internal safeguard policies designed to ensure the preservation of customer property. As senior officers and/or directors of PFG, each of the Defendants named in this count were responsible for adopting and following stringent rules and procedures to segregate and separately maintain PFG's customers' assets from those used to fulfill PFG own obligations and liabilities and would hold its commodity customers assets in a separate account that would be legally and physically distinct from PFG's own accounts, and subject to rigorous accounting processes as well as regulatory reporting and auditing.

124. As such, the defendants named in this count and PFG owed PFG's commodity and option customers, including Plaintiff and the members of the Class, a fiduciary duty to preserve and protect their assets, to act solely in their customer's best interests in connection with its custody and control of their assets, and to avoid any self-dealing.

125. The defendants named in this count knowingly breached their fiduciary duties to Plaintiff and the members of the class by, among other things:

    a. failing to preserve the safety and security of their assets;

    b. failing to adopt and adhere to internal safeguard policies designed to preserve their property;

    c. commingling customer assets with those used to fulfill PFG own obligations and liabilities;

    d. failing to maintain the customer assets in separates account that were legally and physically distinct from PFG's own accounts;

    e. failing to subject its segregated customer funds account to rigorous accounting processes which would insure the integrity of the funds in such account; and

    f. allowing Plaintiff's and Class members' money and property to be used for improper and illegal purposes.

126. As the direct and proximate consequence of the conduct of Defendants Wasendorf Sr., the Other Peregrine Officers and the John Does and PFG described above, Plaintiff and the members of the proposed Class have lost a substantial portion of the money, securities, or other property they deposited with PFG to trade commodity futures contracts, have been denied the use of their property, and have been substantially damaged as a result.

**Count V**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Defendants)**

127. Plaintiff incorporates by reference Paragraphs 1 - 95 of this Complaint, as though fully stated herein.

128. This claim is asserted against all Defendants.

129. Wasendorf Sr., the Other Peregrine Officers, US Bank, NFA, and the John Does and PFG exercised complete dominion and control over its commodity customers' money, securities, or other property which had been deposited with and entrusted to PFG to allow such customers to trade commodity futures and option contracts through PFG.

130. PFG was responsible for preserving the safety and security of its customers' property by adopting internal safeguard policies designed to ensure the preservation of such property. PFG was also responsible for ensuring the integrity of its customers' funds, and enforcing stringent rules to segregate its customers' assets from those used to fulfill PFG's own obligations and liabilities, including maintaining its customers' assets in separate accounts that would be legally and physically distinct from PFG own accounts, and subject to rigorous accounting processes as well as regulatory reporting and auditing.

131. As such, PFG owed its commodity customers, including Plaintiff and the members of the Class, a fiduciary duty to preserve and protect their assets, to act solely in their customer's best interests in connection with its custody and control of their assets, and to avoid any self-dealing.

132. PFG knowingly breached its fiduciary duty to Plaintiff and the members of the class by, among other things:

      a. a failing to preserve the safety and security of their assets;

      b. failing to adopt and adhere to internal safeguard policies designed to preserve their property;

      c. commingling customer assets with those used to fulfill PFG own obligations and liabilities;

35

    d.   failing to maintain the customer assets in separates account that were legally and physically distinct from PFG's own accounts;

    e.   failing to subject its segregated customer funds account to rigorous accounting processes which would insure the integrity of the funds in such account; and

    f.   allowing Plaintiff's and Class members' money and property to be used for improper and illegal purposes.

133.    All Defendants, each of whom were responsible for ensuring PFG's compliance with its own internal policies and procedures and the performance of its fiduciary duties to its customers, knowingly aided and abetted PFG's breach of its fiduciary duties to Plaintiffs and the members of the class because they substantially assisted and knowingly induced and/or participated in the alleged breaches by, among other things:

    a.   failing to properly supervise PFG to ensure that it was preserving the safety and security of its customers' assets;

    b.   failing to require PFG to adopt and/or adhere to internal safeguard policies designed to preserve its customers' property;

    c.   failing to require PFG to segregate its customers' assets from those used to fulfill PFG's obligations and liabilities;

    d.   failing to require PFG to maintain its customers assets in separate accounts that were legally and physically distinct from PFG's own accounts;

    e.   failing to subject PFG's segregated customer funds account to rigorous accounting processes which would insure the integrity of the funds in such account; and

36

      f.   authorizing and allowing PFG's customer funds to be used for improper purposes.

134.    In addition to the above, U.S. Bank aided and abetted breaches of fiduciary duty by Wasendorf Sr. and Does 1-10 by allowing its employees to assist Wasendorf Sr. and Does 1-10 in carrying out their scheme to deceive and defraud PFG customers.

135.    Further, as the custodian of PFG account-holders' Customer Funds, U.S. Bank possessed the true facts about the amount of Customer Funds on deposit in the 1845 Account. By willfully blinding itself to the fact that the balance of funds was patently insufficient for a firm of PFG's size, and by failing to alert regulators to the discrepancy, U.S. Bank aided and abetted Wasendorf Sr. and Does 1-10 in their breaches of fiduciary duty.

136.    In addition to the above, as the industry regulator, NFA failed to supervise, monitor, and investigate and/or willfully blinded itself that Wasendorf Sr. and PFG were not following industry rules that required customer funds be segregated and not commingled or used by the firm itself, absent certain stringent restrictions.

137.    As the direct and proximate consequence of the Defendants' conduct described above, Plaintiff and the members of the proposed Class have lost a substantial portion of the money, securities, or other property they deposited with PFG to trade commodity futures and options contracts, have been denied the use of their property, and have been substantially damaged as a result.

**Count VI**
**Unjust Enrichment**
**(Against Wasendorf Sr., Jeannie Veraja-Snelling, Veraja-Snelling Co., U.S. Bank, N.A., and National Futures Association)**

138.    Plaintiff incorporates by reference Paragraphs 1 - 95 of this Complaint, as though fully stated herein.

139.     This claim is asserted against Defendant Wasendorf Sr., and is stated in the alternative.

140.     During the Relevant Time, Defendant Wasendorf Sr., by and through PFG and/or one or more of the Defendants to this action or other persons whose identities are presently unknown, wrongfully caused approximately $215 million in segregated cash (and/or assets) that lawfully belongs to Plaintiffs and/or members of the proposed Class to be transferred to Defendant Wasendorf Sr.

141.     There now exists a substantial controversy between Defendant Wasendorf Sr. on the one hand and Plaintiffs and the proposed Class on the other hand as to the ownership of the $215 million and/or as to any other cash (and/or assets) in the possession of Defendant Wasendorf Sr. and/or any third parties in receipt of any such money or property that lawfully belongs to Plaintiffs and members of the proposed Class, in an amount not yet ascertained and transferred at a time or times not presently known to Plaintiffs.

142.     By reason of the conduct alleged in the Complaint, including the transfer and/or the receipt by Defendant Wasendorf Sr. of other amounts not yet ascertained at some other time relevant to the allegations in this Complaint that lawfully belongs to Plaintiffs and/or members of the proposed Class, Defendant Wasendorf Sr. has received a significant pecuniary benefit at the expense of Plaintiffs and members of the proposed Class.

143.     Defendant Wasendorf Sr. has been unjustly enriched by the receipt of approximately $215 million in cash (and/or assets) and/or other amounts not yet ascertained that lawfully belongs to Plaintiffs and/or members of the proposed Class.

144.     Upon information and belief, other Defendants listed herein were enriched in that they received fees in amounts not yet ascertained for their work associated with cash and assets

entrusted to Wasendorf Sr., including that the fees were likely taken from the cash and assets entrusted to Wasendorf Sr.

145.    Defendant Wasendorf Sr. and/or one or more of the Defendants to this action or other persons whose identities are presently unknown, delivered to Defendant Wasendorf Sr. cash (and/or assets) that lawfully belongs to Plaintiffs and/or members of the proposed Class, and consequently, Defendants hold such assets in trust for the benefit of the Plaintiff and members of the Class and has a lawful or equitable duty to return such funds to their proper owners.

146.    Defendants. have failed and refused to return to Plaintiffs and members of the proposed Class the cash (and/or assets) that lawfully belongs to them.

147.    It is unlawful and against equity and good conscience to permit Defendants to retain the $215 million in cash (and/or assets) and/or other amounts not yet ascertained that lawfully belongs to Plaintiffs and/or members of the proposed Class.

148.    As a direct and proximate result of the actions of Defendant Wasendorf Sr., PFG and/or one or more of the Defendants to this action or other persons whose identities are presently unknown, Plaintiff and members of the proposed Class have suffered actual and substantial damages in an amount to be determined at trial.

149.    Plaintiff demands the return of all cash (and/or assets) received by Defendants, or any third parties whose identities have not yet been ascertained, that lawfully belongs to Plaintiffs and members of the proposed Class.

**Count VII**
**Theft, Conversion, and Misappropriation**
**(Against Wasendorf Sr. and Does 1-10)**

150.     Plaintiff incorporates by reference Paragraphs 1 - 95 of this Complaint, as though fully stated herein.

151.     This claim is asserted against Defendant Wasendorf Sr and Does 1-10.

152.     Plaintiff and the Class had the right to possess their accounts with PFG and the funds in them.

153.     Defendant Wasendorf Sr. and PFG interfered intentionally with Plaintiff's and the Class Members' possession of their accounts with PFG and the funds in them.

154.     Defendant's interference deprived Plaintiff and the Class Members of possession and/or use of their accounts with PFG and the funds in them.

155.     Defendant's interference caused substantial damage to Plaintiff and members of the proposed Class.

156.     Defendant Wasendorf Sr. and PFG, jointly and severally, stole, converted, and/or misappropriated portions of Plaintiff's accounts and those of members of the proposed Class, including their cash as alleged.

157.     Defendant's tortious misconduct has substantially diminished the marketplace for futures and commodities in the United States and throughout the world. Defendant's misconduct is outrageous, a conscious and deliberate disregard of Plaintiff's and the Class Members' rights, a conscious and deliberate disregard of the rights of customers with cash and/or other items of value on deposit in their accounts and a fraud on the public generally. Punitive damages are required and appropriate to deter such misconduct.

**Count VIII**
**Aiding and Abetting Conversion Theft, Conversion, and Misappropriation**
**(Against All Defendants)**

158.    Plaintiff incorporates by reference Paragraphs 1-95 of this Complaint, as though fully stated herein.

159.    By virtue of their positions as officers or agents of PFG, Wasendorf Jr., Aslin, Cuypers, O'Meara and Does 1-10 were under a duty to control, oversee, and manage PFG's handling of segregated Customer Funds, and had the ability to do so.

160.    As such, they knew, or in the reasonable exercise of their duties should have known, of the theft, conversion, and misappropriation of Customer Funds by Wasendorf Sr. and Does 1-10.  Specifically, and without limitation, they knew or should have known that the amount of funds in the 1845 Account did not match with the amount of funds claimed in PFG's financial reports.

161.    By failing to undertake even minimal investigation of the activities of Wasendorf Sr. and Does 1-10, and by abdicating their duty to control, oversee, and manage PFG's handling of segregated Customer Funds, Wasendorf Jr., Aslin, Cuypers, and O'Meara provided substantial assistance to Wasendorf Sr. and Does 1-10 in theft, conversion, and misappropriation of Customer Funds.

162.    By virtue of their positions as PFG's auditors, Veraja-Snelling Company, Veraja-Snelling, and Does 1-10 were under a duty to oversee, investigate, and verify PFG's financial reports, including reports regarding the handling of Customer Funds.

163.    As such, they knew, or in the reasonable exercise of their duties should have known, of the conversion of Customer Funds by Wasendorf Sr. and Does 1-10.  Specifically, and without limitation, they knew or should have known that the amount of funds in the 1845 Account did not match up with the amount of funds claimed in PFG's financial reports.

164.    By failing to undertake even minimal investigation of the activities of Wasendorf Sr. and Does 1-10, and by abdicating their duty to oversee, investigate, and verify PFG's financial reports, Veraja-Snelling Company, Veraja-Snelling, and Does 1-10 provided substantial assistance to Wasendorf Sr. and Does 1-10's theft, conversion, and misappropriation of Customer Funds.

165.    By virtue of its position as custodian of the 1845 Account, U.S. Bank was under a duty to produce accurate reports for the account, to safeguard the funds in the account in accordance with the requirements of the CEA, the General Regulations, and other provisions of law, and to oversee its employees in the discharge of their duties.

166.    As such, U.S. Bank knew, or in the reasonable exercise of its duties should have known, of the conversion of Customer Funds by Wasendorf Sr. and Does 1-10.  Specifically, and without limitation, it knew or should have known that the amount of funds in the 1845 Account was patently insufficient for a broker of PFG's size and financial footprint.  Further, U.S. Bank knew, or in the reasonable exercise of its duties should have known, of its employee's or employees' assistance to Wasendorf Sr. and Does 1-10 in carrying out their scheme to steal, convert, and misappropriate Customer Funds.

167.    By failing to undertake even minimal investigation of the activities of Wasendorf Sr. and Does 1-10, and by abdicating its duties as the custodian of the 1845 Account, including its duty to oversee its employees, U.S. Bank provided substantial assistance to Wasendorf Sr. and Does 1-10 in theft, conversion, and misappropriation of Customer Funds.

168.    By virtue of its position as the industry regulator, NFA was under a duty to regulate and monitor its members and their accounts designed to safeguard Customer Funds in

accordance with the requirements of the CEA, the General Regulations, and other provisions of law.

169.    As such, NFA knew, or in the reasonable exercise of its duties should have known, of the conversion of Customer Funds by Wasendorf Sr. and Does 1-10.  Specifically, and without limitation, it knew or should have known that the amount of funds in the 1845 Account was patently insufficient for a broker of PFG's size and financial footprint.  Further, NFA knew or should have known that the amount of funds in the 1845 Account did not match up with the amount of funds claimed in PFG's financial reports.

170.    By failing to undertake even minimal investigation of the activities of Wasendorf Sr. and Does 1-10, and by abdicating its duties as industry regulator, NFA provided substantial assistance to Wasendorf Sr. and Does 1-10 in theft, conversion, and misappropriation of Customer Funds.

**171.**    As a proximate result of the substantial assistance of Defendants to Wasendorf Sr. and Does 1-10's conversion of Customer Funds, Plaintiff and the Class suffered damages.

### Count IX
### Tortious Interference with Contract Rights
### (Against Wasendorf Sr.)

172.    Plaintiff incorporates by reference Paragraphs 1 - 95 of this Complaint, as though fully stated herein.

173.    This claim is asserted against Defendant Wasendorf Sr.

174.    Plaintiff and the Class had deposited money in their accounts pursuant to a written agreement to secure, margin and/or guarantee trades and/or contract of Plaintiff and the Class. Plaintiffs and Class members had contract rights with PFG stemming from the CEA and industry regulations that PFG would treat and deal with Plaintiff's money in their accounts as belonging

to Plaintiff. Plaintiff and the Class Members had contract rights that the money in their accounts would be separately accounted for and not commingled with or be used to margin or guarantee the trades or contracts of, or to secure or extend the credit of, any person other than Plaintiff and Class Members.

175.    Defendant Wasendorf Sr. was aware of the existence of a contractual relationship between members of the Class and PFG and intentionally interfered with Plaintiff's and Class Members' contract rights, directly and proximately causing damage to Plaintiffs and the Class.

176.    Defendant Wasendorf Sr. tortious interference with contract rights as aforesaid is outrageous and a conscious and deliberate disregard of the rights of Plaintiff and the members of the Class. Defendants Wasendorf Sr. interfered with the contract rights of others who had similar contracts with PFG.

177.    Defendant's tortious misconduct has substantially diminished the marketplace for futures and commodities in the United States and throughout the world. Defendant Wasendorf Sr.'s misconduct is outrageous, a conscious and deliberate disregard of Plaintiff's rights, a conscious and deliberate disregard of the rights of customers with cash and/or other items of value on deposit in their accounts and a fraud on the public generally. Punitive damages are required for such misconduct.

## Count X
## Aiding and Abetting Tortious Conduct
### (Against Other Peregrine Officers, Auditors, U.S. Bank, National Futures Association and Does 1-10)

178.    Plaintiff incorporates by reference Paragraphs 1 - 95 of this Complaint, as though fully stated herein.

179.    This claim is asserted against the Other Peregrine Officers, the Auditors, U.S. Bank, National Futures Association, and the John Does.

180. Additionally, PFG stood in a fiduciary relationship with Plaintiff. This status imposed on the PFG, in particular, an affirmative duty of utmost good faith, and full and fair disclosure of all material facts. PFG breached this fiduciary duty.

181. If and to the extent that a Defendant named in this count did not commit a tort as principal, such Defendant caused harm to Plaintiff resulting from the tortious conduct of each other and PFG, and each Defendant aided and abetted such tortious conduct and is subject to liability because such Defendant:

   a. recklessly disregarded that the conduct alleged in this Complaint constituted a breach of duty and contract and/or gave substantial assistance or encouragement to the other; and/or

   b. gave substantial assistance to each other and/or PFG in accomplishing a tortious result and breach of contract such Defendant's own conduct, separately considered, constituted a breach of duty to Plaintiffs and the other members of the Class; among other things, each Defendant approved and facilitated the aforesaid unlawful conduct and had he or she properly performed his or her legal responsibilities he, she or it could and would have prevented the unlawful conduct alleged and each of them owed a fiduciary duty to Plaintiffs which he, she or it breached as alleged.

182. As the direct and proximate consequence of the Defendants' conduct described above, Plaintiff and the members of the proposed Class have lost a substantial portion of the money, securities, or other property they deposited with PFG to trade futures contracts, have been denied the use of their property, and have been substantially damaged as a result.

**Count XI**
**Negligence**
**(Against Other Peregrine Officers, Auditors, U.S. Bank, National Futures Association, and John Does)**

183.     Plaintiff incorporates by reference Paragraphs 1 - 95 of this Complaint, as though fully stated herein.

184.     This claim is asserted against the Other Peregrine Officers, the Auditors U.S. Bank, National Futures Association, and the John Does 1-10.

185.     The Other Peregrine Officers, the Auditors , U.S. Bank, N.A., National Futures Association, and the John Does had a duty to exercise reasonable care to examine the books and records of PFG, ensure the proper and safe handling of customer funds, and supervise the safety of customer funds. By virtue of Defendant Wasendorf Sr.'s admitted fraud and theft of customer funds from Plaintiff and the Class, each of the Defendants named in this count were negligent.

186.     As the direct and proximate consequence of the Defendants' negligent conduct described above, Plaintiff and the members of the proposed Class have lost a substantial portion of the money, securities, or other property they deposited with PFG to trade futures contracts, have been denied the use of their property, and have been substantially damaged as a result.

**Count XII**
**Negligent Supervision**
**(Against U.S. Bank and National Futures Exchange)**

187.     Plaintiff incorporates by reference Paragraphs 1 - 95 of this Complaint, as though fully stated herein.

188.     U.S. Bank and NFA were under stringent obligations to oversee and protect Customer Funds.

189.     As to U.S. Bank, part of that obligation consisted of taking reasonable care to ensure that its employees who worked with the 1845 Account were capable and trustworthy.

190.    As such, U.S. Bank knew, or in the exercise of ordinary care should have known, of its employee or employees' unfitness at the time they engaged in the wrongful or tortious conduct of assisting Wasendorf Sr. and Does 1-10 in their scheme.

191.    As to NFA, part of that obligation consisted of monitoring and supervising the Customer Accounts and financial statements of PFG.

192.    As such, NFA knew, or in the exercise of ordinary care should have known, of its employee or employees' unfitness to monitor and supervise Wasendorf Sr. and Does 1-10 at the time they engaged in the wrongful or tortious conduct of assisting Wasendorf Sr. and Does 1-10 in their scheme.

193.    Through U.S. Bank and NFA's negligent supervision of their employee or employees, the employee or employees' incompetence, unfitness, or dangerous characteristics proximately caused injuries to the Plaintiff and the Class through the misappropriation of their Customer Funds.There was an employment or agency relationship between U.S. Bank and the employee or employee in question.

## VII.  <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class prays for judgment as follows:

a.      For an order certifying the Class and appointing Plaintiff and their counsel to represent the Classes;

b.      For judgment against defendants Russell R. Wasendorf, Sr., Russel R. Wasendorf Jr., Neil J. Aslin, Brenda Cuypers, Susan O'Meara, Veraja-Snelling Company, Jeannie Veraja-Snelling, U.S. Bank, N.A., National Futures Association, and John Does 1-10,

including without limitation judgment for compensatory, statutory, punitive, and/or exemplary damages as allowed by law;

c.　　　For creation of a constructive trust on Defendants' ill-gotten gains;

d.　　　For restitution, disgorgement, or such other equitable remedies as allowed by law;

e.　　　For pre-judgment and post-judgment interest in the maximum amount as allowed by law;

f.　　　For attorney's fees and costs, including without limitation expert fees and other litigation expenses, incurred by Plaintiffs as allowed by law;

g.　　　For such other and further relief as this Court deems just and proper.

## VIII.　<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this complaint so triable.

**Dated:**　August 31, 2012

Respectfully submitted,

**HOLLAND, GROVES, SCHNELLER &
STOLZE LLC**
/s/ Eric D. Holland
Eric D. Holland – #06207110
R. Seth Crompton - #6288095
300 N. Tucker, Suite 801
St. Louis, Missouri 63101
Tel:  314-241-81111
Fax:  314-241-5554
eholland@allfela.com
scrompton@allfela.com


**LEVIN FISHBEIN SEDRAN BERMAN**

Charles E. Schaffer
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Tel:  877-882-1011
Fax: 215-592-4663
cschaffer@lfsblaw.com